Filed 2/8/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MOJAVE PISTACHIOS, LLC et al., | |
| Petitioners, | G062327 |
| v. | (Super. Ct. No. 30-2021-01187589) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| INDIAN WELLS VALLEY GROUNDWATER AUTHORITY et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for writ of mandate after the superior court sustained real party in interest's demurrer to petitioners' third amended petition and complaint. William D. Claster, Judge. Requests for judicial notice granted. Petition denied.

Brownstein Hyatt Farber Schreck, Scott S. Slater, Amy M. Steinfeld, and Elisabeth L. Esposito for Petitioners.

Best Best & Krieger, Jeffrey V. Dunn, Eric L. Garner, Wendy Y. Wang, and Sarah Christopher Foley for Searles Valley Minerals, Inc. and California Building Industry Association as Amici Curiae on behalf of Petitioners.

Jason Resnick for Western Growers Association as Amicus Curiae on behalf of Petitioners.

Christian C. Scheuring for California Farm Bureau Federation as Amicus Curiae on behalf of Petitioners.

Egoscue Law Group, Tracy J. Egoscue and Tarren A. Torres for Western Growers Association, California Farm Bureau Federation, Dairy Cares, and American Pistachio Growers as Amici Curiae on behalf of Petitioners.

Allen Matkins and David L. Osias for Elizabeth Cardoza, Clay Daulton, David Gill, Landon Gill, Michele Lasgoity, Monica Lasgoity, Rosemary Lasgoity, Jeff Lefors, Mark Peters, Sally Roberts, Candace Khanna, Rakesh Khanna, Taisto Smith, SWD Investments, Inc., and SWD Investments-Fulton Ranch, Inc. (Madera Landowners) as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Richards, Watson & Gershon, James L. Markman, Kyle H. Brochard, and Jacob C. Metz for Real Parties in Interest.

\*       \*       \*

Mojave Pistachios, LLC[1] owns about 1,600 acres of land in the Mojave Desert.  On that acreage, it has planted a pistachio orchard that it irrigates exclusively

---

[1]     The petitioners in this case are Mojave Pistachios, LLC and Paul G. Nugent and Mary E. Nugent as Trustees of the Nugent Family Trust dated June 20, 2011.  We refer to them collectively as Mojave.

2

with groundwater pumped from the underlying water basin.  The Department of Water Resources has determined that basin is at risk for overdraft.  Mojave currently extracts about 4,000 acre-feet (roughly 1.3 billion gallons) of groundwater per year, but as its trees mature, it anticipates it will need as much as 7,000 acre-feet (about 2.3 billion gallons) per year.[2]

Shortly after Mojave planted its pistachio trees, the California Legislature enacted the Sustainable Groundwater Management Act (Wat. Code,[3] § 10720 et seq.) (SGMA), which requires the creation of groundwater sustainability plans to manage high priority groundwater basins.  Acting pursuant to that legislation, the local groundwater sustainability agency, Indian Wells Valley Groundwater Authority (the Authority), determined that, subject to certain exceptions discussed below, all groundwater extractions in the basin where Mojave's orchard is located would be subject to a basin replenishment fee of $2,130 per acre-foot of groundwater starting in 2021.[4]

Mojave refused to pay the replenishment fee and filed this lawsuit attacking the Authority's groundwater sustainability plan and related implementing actions, including the imposition of the replenishment fee.  According to Mojave, through those implementing actions, the Authority violated Mojave's vested common law water right to pump native groundwater from the basin for use on its land and then illegally made that water available to other users.

---

[2]    Groundwater is measured in acre-feet.  An acre-foot equals a volume of water spread over one acre in area and one foot in depth.  One acre-foot is approximately 326,000 gallons.

[3]    All further undesignated statutory references are to this code.

[4]    As Benjamin Franklin once famously observed, "When the well's dry, we know the worth of water."

3

A series of demurrers followed. In the most recent round, respondent court sustained the Authority's demurrer to certain causes of action in Mojave's third amended complaint, finding the claims at issue are barred by California's "pay first, litigate later" rule, which, subject to certain exceptions, requires a taxpayer to pay a tax before commencing a court action to challenge the tax's collection. The court also concluded Mojave failed to allege facts sufficient to support its takings causes of action.

Mojave petitioned this court for a writ of mandate overruling respondent court's order sustaining the demurrer. As a matter of first impression, we conclude the well-established "pay first" rule applies to lawsuits challenging fees imposed by a local groundwater sustainability agency under SGMA. Because any alleged economic harm to Mojave stems from the imposition of the replenishment fee, we further conclude the "pay first" rule bars the challenged causes of action.

We recognize the application of the "pay first" rule may at times seem Draconian, and the positions of both parties have arguable merit. On the one hand, we have farmers who have invested significant funds to plant their crops; who claim to have enjoyed the benefits of free groundwater for decades; who may be required to pay millions of dollars in fees annually for what had historically been free; and who are legally barred from litigating the propriety of those fees due to their failure to pay them up front. On the other hand, we have a local water agency that has been assigned the Herculean tasks of creating a groundwater sustainability plan for what the record suggests is an overdrafted basin; fairly allocating a limited amount of groundwater between a number of competing users; and calculating an equitable way to fund the importation of water from other sources.

While we appreciate the arguments made by both sides, we conclude on balance that our Constitution, SGMA, and sound public policy require a water user to pay any outstanding fee imposed under SGMA before commencing a court action to challenge the fee and obtain a refund. We therefore deny the requested writ relief.

4

**FACTS**

1.      *The Indian Wells Valley Groundwater Basin*

There are hundreds of designated groundwater basins and subbasins throughout California, underlying about 62,000 square miles (42 percent) of the state. The groundwater in these basins is a major part of California's water supply, providing close to 40 percent of the state's supply during wet years and up to 60 percent in dry years.[5]

According to the Department of Water Resources, many of California's groundwater basins are critically overdrafted, meaning "the average annual amount of groundwater extraction exceeds the long-term average annual supply of water to the basin. Effects of overdraft can include seawater intrusion, land subsidence, groundwater depletion, and chronic lowering of groundwater levels."[6]

The Department of Water Resources has concluded the Indian Wells Valley Groundwater Basin (the Basin) is an overdrafted groundwater basin. Located in the northwestern part of the Mojave Desert to the east of the Sierra Nevada Mountains, the Basin extends across roughly 382,000 acres (600 square miles) under portions of Kern County, Inyo County, and San Bernardino County. The Basin does not have any water

---

[5]     See Dept. of Water Resources, California's Groundwater (Bulletin 118) Update 2020, p. 103, https://data.cnra.ca.gov/dataset/3f87088d-a2f9-4a46-a979-1120069db2c6/resource/d2b45d3c-52c0-45ba-b92a-fb3c90c1d4be/download/calgw2020_full_report.pdf [as of Feb. 8, 2024], archived at: <https://perma.cc/R4HW-BY4N>, and Dept. of Water Resources, California's Groundwater Update 2020 Fact Sheet, https://water.ca.gov/programs/groundwater-management/bulletin-118 [as of Feb. 8, 2024], archived at: <https://perma.cc/54QS-UUC3>.

[6]     See Dept. of Water Resources, Critically Overdrafted Basins, https://water.ca.gov/programs/groundwater-management/bulletin-118/critically-overdrafted-basins [as of Feb 8, 2024], archived at: <https://perma.cc/7GSW-J7XF>.

importation infrastructure or significant surface water features, so water producers must rely exclusively on groundwater to meet their water demands.

According to the Department of Water Resources, groundwater levels in the Basin have been steadily declining since 1945. The Authority estimates the Basin has total annual outflows of 32,640 acre-feet and total annual inflows of 7,650 acre-feet, meaning the Basin sustains an average loss of groundwater storage of about 25,000 acre-feet per year.

Nearly 80 percent of the Basin is under federal lands. These lands are home to the United States Navy's (the Navy) single largest landholding in the world, Naval Air Weapons Station China Lake. Although the Navy's annual groundwater extractions from the Basin have declined since the 1970's, the Navy continues to extract Basin groundwater for use at the base.

The rest of the Basin is primarily used for residential and agricultural purposes. The farming operations there, including Mojave, use Basin groundwater to irrigate their crops.

2.  *Mojave's Farming Operations and Water Usage*

Mojave owns or leases about 3,200 acres of land spread across over 80 parcels in Kern County, all overlying the Basin. Mojave currently uses much of its land to grow pistachio nuts, but that was not always the case.

According to Mojave, groundwater extractions on its property began in 1975. From 1975 to 1988, about 600 acres were used to grow alfalfa, and groundwater usage ranged from about 1,200 to 4,000 acre-feet per year. The property used no groundwater from 1989 to 2003. In 2004, alfalfa farming resumed on 160 acres, with water usage averaging about 1,000 acre-feet per year from 2004 to 2012.

In 2013, Mojave stopped farming alfalfa and began planting pistachio trees. Mojave had to replant many of its trees in 2014 and 2015. Its initial planting covered about 350 acres; after the replanting, its pistachio orchards now span about 1,600 acres.

6

Mojave irrigates its pistachio orchards entirely with Basin groundwater, which it pumps from wells on the parcels; it also uses Basin groundwater for dust mitigation. According to Mojave, it has a vested overlying water right to pump that groundwater from the Basin.

Mojave began using groundwater on its pistachio trees in 2013; it used only 325 acre-feet that first year. Mojave's water usage for its pistachio trees increased to 3,700 acre-feet the following year and ranged from about 3,000 to 4,100 acre-feet per year from 2014 to 2019. For most of that time, there was no government-imposed fee on the extraction of groundwater in the Basin, so Mojave's irrigation costs were limited to the cost of well repair, maintenance, and electricity.

Mojave completed its first commercial pistachio harvest in 2020 on about 350 acres. According to Mojave, its trees are expected to reach peak production around 2030 and have a commercial life expectancy of at least 75 years.

As pistachio trees mature, they need more water each year. Mojave estimates that from 2023 to 2029, its annual usage will increase from about 4,160 acre-feet per year to about 5,600 acre-feet per year. It further anticipates that from 2030 to 2080, it will need "at least" 6,000 acre-feet per year of water, and it could require as much as 7,000 acre-feet per year.

3. *SGMA*

In September 2014, our Legislature passed SGMA to provide for the sustainable management of California's groundwater basins. The Legislature's stated goals in enacting SGMA include establishing minimum standards for sustainable groundwater management, giving local groundwater authorities the power and support to sustainably manage groundwater, and creating a more efficient and cost-effective groundwater adjudication process that protects water rights, ensures due process, and prevents unnecessary delay. (§ 10720.1.)

SGMA, which took effect in January 2015, required that all basins designated as high or medium priority be managed under a groundwater sustainability plan by January 31, 2020. (§ 10720.7, subd. (a)(1); see §§ 10727-10728.6.) It also authorized the creation of groundwater sustainability agencies to develop and create such plans (§§ 10723-10724), and granted those agencies a number of powers, including the power to perform any act necessary to carry out SGMA's purposes (§ 10725.2, subd. (a)); to adopt rules and regulations (*id.*, subd. (b)); to conduct investigations (§ 10725.4, subd. (a)); to mandate the use of water-measuring devices (§ 10725.8); to acquire real property, personal property, and water rights (§ 10726.2, subd. (a)); to import water (*id.,* subd. (b)); and to create voluntary fallowing programs for agricultural lands (§ 10726.2, subd. (c)), among other powers.

SGMA also empowered groundwater agencies to impose fees on groundwater extraction to fund the costs of groundwater sustainability programs, groundwater management, investigations, and enforcement. (§§ 10730, subd. (a), 10730.2, subd. (a).) If any owner or operator knowingly fails to pay a fee on time, he or she is liable to the agency for penalties and interest. (§ 10730.6, subd. (b).) The agency may sue the owner or operator to recover any delinquent fees, interest, or penalties (*id.*, subd. (c)) and may order him or her to cease all groundwater extraction until the delinquent fees are paid (*id.*, subd. (e)).

If a person disagrees with fees imposed by the agency, SGMA provides that he or she "may pay" the fee "under protest and bring an action against the governing body in the superior court to recover any money that the governing body refuses to refund." (§ 10726.6, subd. (d) (section 10726.6(d)).) Any judicial action attacking an ordinance that imposes or increases a fee must be commenced within 180 days of the ordinance's adoption. (*Id.*, subd. (c).)

SGMA specifies that it does not modify rights to use groundwater, and it expressly prohibits groundwater sustainability plans from determining water rights.

8

(§ 10720.5, subd. (a), (b).) To that end, the Legislature expressed an intent to enhance local groundwater management in a manner "consistent with rights to use or store groundwater and Section 2 of Article X of the California Constitution," and to "preserve the security of water rights in the state to the greatest extent possible consistent with the sustainable management of groundwater." (§ 10720.1, subd. (b).)

SGMA allows a claimant to file an adjudication action to determine rights to extract groundwater from a basin, including an action to quiet title regarding those rights, and it requires that any such action be conducted in accordance with Code of Civil Procedure section 830 et seq., which governs groundwater cases. (§§ 10720.5, subd. (c), 10721, subd. (a), 10737-10738.) A court may not enter judgment in such cases unless it "finds that the judgment will not substantially impair the ability of a groundwater sustainability agency . . . to achieve sustainable groundwater management." (§ 10737.8.)

4.  *The Authority and Its Groundwater Sustainability Plan*

The Department of Water Resources designated the Basin as a high-priority basin subject to critical overdraft. The Basin was therefore required under SGMA to adopt a groundwater sustainability plan by 2020.

In 2016, five local agencies—Kern County, Inyo County, San Bernardino County, the Indian Wells Valley Water District, and the City of Ridgecrest—created the Authority as a joint powers authority to serve as the groundwater sustainability agency for the Basin.[7] The Authority spent several years preparing a groundwater sustainability plan as required by SGMA, seeking input from a policy advisory committee and a technical advisory committee. Mojave participated in this process.

The Authority adopted its groundwater sustainability plan in January 2020. In its plan, the Authority determined that the Basin cannot achieve groundwater

---

[7] The Authority also has two associate members—the Navy and the United States Bureau of Land Management.

9

sustainability through extraction reductions alone; rather, augmentation and overdraft mitigation projects must be developed. To finance those projects, the Authority determined it would need to charge fees to the entities and individuals who will benefit from them.

The Authority then took several steps to implement its groundwater sustainability plan (collectively, the Implementing Actions). Those Implementing Actions are the crux of this case.

a. *The Sustainable Yield Report*

First, in July 2020, the Authority adopted and approved a report on the Basin's sustainable yield—that is, the maximum amount of water that can be withdrawn annually from a groundwater supply without causing chronic lowering or other undesirable results (see § 10721, subd. (w), (x)). According to this document (the Sustainable Yield Report), the Basin's sustainable yield is 7,650 acre-feet per year.[8]

The report explained that the Basin is solely dependent on groundwater; current outflows are about four times the estimated inflows; groundwater levels are dropping by up to 2.5 feet annually; the Basin does not currently have access to imported water; and up to 50 miles of infrastructure must be built in order to import water.

The report further noted that the majority of groundwater extractions in the Basin are by six large producers, one of which is Mojave. According to the report, Mojave estimates its future extraction demands will be about 7,200 acre-feet per year, or roughly 94 percent of the Basin's sustainable yield. Two of the other largest producers each reported historical extractions in excess of the Basin's sustainable yield. Collectively, those six producers' extractions totaled nearly 3.5 times the estimated inflow to the Basin. Thus, concluded the Authority, without changes to the Basin's

---

[8] In its briefing and at oral argument, Mojave contends this is a gross underestimation and lacks factual support.

10

overdraft condition, its groundwater infrastructure will not be able to produce the needed water by 2065.

The report also discussed the Navy's federal reserve water right interest. Since the Navy had expressly declined to quantify that interest,[9] the Authority estimated the Navy's potential interest by using data the Navy provided on its pumping history and concluded the Navy could make a convincing argument that the Basin's entire sustainable yield was subject to the Navy's federal reserve water right interest. The Authority also determined it cannot regulate the Navy's groundwater usage or charge the Navy for any fees for groundwater production.[10]

The report then concluded that all groundwater extractors in the Basin (excluding the federal government and any de minimis extractors)[11] will be beneficially impacted by overdraft mitigation and augmentation projects and therefore should be responsible for the "significant costs" of those projects. The report observed that the cost of those projects will mean "the likely cessation of large-scale agricultural uses in the Basin due to the increased cost for surface water," but the cost "does not prevent such a use." It added that "the Central Valley is expected to see very significant reductions in crop lands due to import water supply costs," and "Kern County alone is expected to see upwards of 185,000 acres of currently farmed land in the Central Valley to be permanently fallowed" (i.e., left unsown).

---

[9] The Navy maintains its interest is not limited to its current on-base demand of 2,041 acre-feet, and its interest will likely be established, if ever, through litigation.

[10] Under SGMA, the federal government may "voluntarily agree" to participate in a groundwater sustainability plan, but federally reserved water rights to groundwater must be "respected in full." (§ 10720.3, subds. (c), (d).)

[11] SGMA prohibits charging fees to the federal government (§ 10720.3, subds. (a-c)) or de minimis pumpers (§ 10730, subd. (a)).

11

b.      *The Replenishment Fee and Exempted Pumping Allotments*

In August 2020, the Authority adopted Ordinance No. 03-20, which provides that all groundwater extractions (except those by federal and de minimis extractors) will be subject to a Basin replenishment fee of $2,130 per acre-foot starting in January 2021, to be paid on a monthly basis (the Replenishment Fee).[12] According to the Authority, the Replenishment Fee is necessary to fund the significant costs of bringing in supplemental water (estimated to be at least $52 million), and also mitigating damage to shallow wells that may be impacted by dropping water levels.

Ordinance No. 03-20 also allocated the Basin's 7,650 acre-feet sustainable yield to several entities (e.g., Kern County, the City of Ridgecrest, and small water companies providing domestic water services), granting to each an annual "Exempted Pumping Allotment" that is not subject to the Replenishment Fee. For example, the City of Ridgecrest received an allotment of 373 acre-feet per year, meaning that the first 373 acre-feet of groundwater it pumps will not be subject to the Replenishment Fee. Neither Mojave nor any other agricultural producers received an Exempted Pumping Allotment.

c.      *The Transient Pool and Fallowing Program*

In August 2020, the Authority created a transient pool and fallowing program to facilitate coordinated production reductions among groundwater users and encourage a shift away from overdraft reliance (Transient Pool and Fallowing Program). Under this program, the Authority established a transient pool of 51,000 acre-feet of groundwater and determined that all qualified agricultural pumpers would receive a transient pool allotment based on their reported agricultural uses. Eligible pumpers could then either (1) reject their allotment and continue pumping while paying the Replenishment Fee, (2) accept their allotment and associated mitigation fee, or (3) accept

---

[12]      By the court's calculation, this translates to about two-thirds of a cent ($0.0065) per gallon.

12

the allotment and negotiate a sale of it to the Authority. Use of the transient pool was voluntary.

Ten agricultural pumpers, including Mojave, were deemed "'potentially' qualified" to participate in the program. Three of those pumpers, including Mojave, failed to timely submit a required pumping verification questionnaire, so the Authority determined they were not eligible to participate. The 51,000 acre-feet in the transient pool were thereafter allotted among the seven eligible agricultural pumpers.

### 5. *Mojave's Failure to Pay the Replenishment Fee*

The collective effect of the Implementing Actions on Mojave is significant: Mojave, which received neither an allotment from the transient pool nor an Exempted Pumping Allotment, must pay the Replenishment Fee of $2,130 per acre-foot for any groundwater it extracts from the Basin. Thus, Mojave went from paying no government-imposed fee on the extraction of water as recently as 2017[13] to owing over $8 million annually in Replenishment Fees.

Claiming it lacks the funds to pay, Mojave has not paid any portion of the Replenishment Fee since Ordinance No. 03-20 took effect in early 2021, although it continues to extract groundwater to irrigate its trees. According to Mojave, if Ordinance No. 03-20 is enforced, it will render Mojave's farming operations "economically unviable" because the cost of water will exceed its gross revenues.

### 6. *Relevant Procedural History*

In September 2020, Mojave filed a verified petition for writ of mandate and complaint against the Authority in Kern County Superior Court, challenging the

---

[13] In 2018, the Authority passed an ordinance requiring all groundwater extractors to pay $30 per acre-foot for all groundwater extracted in the Basin (the Extraction Fee). The Extraction Fee was later increased to $105 per acre-foot. According to Mojave, it has paid the Extraction Fees in full, with total payments exceeding $1 million.

Authority's groundwater sustainability plan and related actions. (Case No. BCV-20-102284.) In January 2021, Mojave filed its first amended verified petition for writ of mandamus and complaint (FAC), challenging the Authority's groundwater sustainability plan, the Implementing Actions, and certain post-adoption decisions.

The FAC is 135 pages long and alleges 20 causes of action, including claims for alleged violations of SGMA and the California Constitution, regulatory and physical takings, and due process violations, among others. The crux of Mojave's petition is that the Authority's groundwater sustainability plan illegally deprived Mojave of its vested appurtenant overlying water rights to pump groundwater from the Basin by conditioning Mojave's continued use of groundwater on the payment of the Replenishment Fee.

Mojave's case against the Authority was consolidated with an action filed by Searles Valley Minerals Inc. asserting similar challenges to the Authority's groundwater sustainability plan. (Case No. BCV-20-102285.) The consolidated actions were then transferred by stipulation to the Superior Court of Orange County and assigned new case numbers. (Case Nos. 30-2021-01187589 and 30-2021-01187275.)

Mojave filed a separate action in the Superior Court of Orange County against the Indian Wells Valley Water District, seeking to quiet title to its water rights and a physical solution. (Case No. 30-2021-01187275.) That case has been expanded by cross-complaint into a comprehensive adjudication of water rights in the Basin and has been deemed related to the consolidated cases.

In April 2021, Mojave filed an ex parte application in the present case for a temporary restraining order and an order to show cause why a preliminary injunction should not issue enjoining the Authority from taking any action to implement the Replenishment Fee in Ordinance No. 03-20. Respondent court denied Mojave's application in May 2021. The court reasoned that California's "pay first, litigate later"

14

rule barred injunctive relief as to the Replenishment Fee because Mojave had not yet paid the fee it seeks to invalidate, and none of the exceptions to the "pay first" rule applied.

In June 2021, Mojave petitioned this court for a writ of mandate as to the ruling. We denied Mojave's writ petition without prejudice, finding Mojave had not yet experienced irreparable harm because the Authority had not yet filed a civil action to enjoin Mojave's extractions. (No. G060336.) We noted then that the petition was denied for "prudential reasons, not as a signal regarding the correctness of the challenged order denying a preliminary injunction or the merits of the underlying dispute."

Around the same time, the Authority held a public hearing on Mojave's failure to pay the Replenishment Fee. After the hearing, the Authority adopted a resolution ordering Mojave to stop pumping Basin groundwater until its fee payments became current. The Authority also indicated that if Mojave continued to extract water from the Basin without paying the Replenishment Fee, the Authority would initiate court proceedings to enforce its order.

Later that month, the Authority filed a demurrer to Mojave's FAC, attacking some but not all of the causes of action in the FAC. As to cause of action Nos. 6 (challenging the Replenishment Fee), 14 to 16 (regulatory and physical takings), and 17 and 18 (due process), the Authority argued those claims must be dismissed under the "pay first" rule because Mojave has failed to pay the Replenishment Fee.[14]

Respondent court found the "pay first" rule applied, noting that the challenged causes of action, despite their labels, all fundamentally sought to challenge and impede the collection of the Replenishment Fee. Accordingly, the court sustained the Authority's demurrer to the sixth cause of action (challenging the Replenishment Fee)

---

[14] The Authority also challenged the thirteenth cause of action on that basis, but Mojave later voluntarily dismissed that cause of action, among others, so we will not discuss it further here.

15

without leave to amend, and it sustained the demurrer to the fourteenth through eighteenth causes of action (takings and due process claims) with leave to amend.

Weeks later Mojave filed its second amended verified petition for writ of mandamus and complaint (SAC), this time asserting 15 causes of action for violations of SGMA, regulatory and physical takings, and due process violations, among other claims. In light of respondent court's demurrer ruling on the "pay first" rule, Mojave deleted the cause of action challenging the Replenishment Fee; it also removed references to the "Replenishment Fee" from its takings claims. The Authority filed another demurrer.

Meanwhile, in January 2022, the Authority filed a complaint against Mojave in the Superior Court of Orange County, seeking recovery of the delinquent groundwater fees, civil penalties, and preliminary and permanent injunctive relief. (Case No. 30-2022-01239479.) That case is related to the present action, and according to the parties, the Authority's request for injunction is still pending.

Before the hearing on the Authority's demurrer to the SAC in the present action, Mojave sought leave to file a third amended petition and complaint (TAC). In its moving papers, Mojave explained that the amendments in the proposed TAC "make[] clear that this lawsuit is not a challenge to the Replenishment Fee but to the predicate unlawful allocation decision that preceded the imposition of the fee and which violates SGMA and constitutes a taking."

Respondent court took the Authority's demurrer to the SAC off calendar and largely granted Mojave's motion for leave to file its TAC. The TAC asserts 15 causes of action for violations of SGMA, regulatory and physical takings, and due process violations, among other claims.

As relevant here, the fifth cause of action in the TAC challenges the Exempted Pumping Allotments[15] in Ordinance No. 03-20, asserting the Authority

_____

[15] Mojave's TAC and briefing refer to these as "Annual Pumping Allocations" rather than use the terminology in Ordinance No. 03-20 ("Exempted

16

arbitrarily and capriciously granted groundwater pumping allotments to certain users, but not Mojave, in violation of Mojave's common law and constitutional rights to water. According to Mojave, "because [Mojave was] denied any [Exempted] Pumping [Allotments], [Mojave] can no longer rely on [its] prior and paramount overlying right to pump [its] correlative share of the Basin's native yield, and instead must pay the Replenishment Fee." (TAC ¶ 402.) Mojave therefore seeks a writ of mandate compelling the Authority to prevent the implementation of the Exempted Pumping Allotments and to comply with all applicable laws in adopting accurate and legal allotments.

Cause of action Nos. 9 through 11 of the TAC allege the Authority, through the adoption of its groundwater sustainability plan, the Sustainable Yield Report, the Transient Pool and Fallowing Program, and the Exempted Pumping Allotments, has deprived Mojave of all economically beneficial use of its water rights and pistachio trees, and this amounts to a physical and regulatory taking of private property without just compensation in violation of the state and federal constitutions and section 1983 of title 42 of the United States Code.

The Authority filed yet another demurrer to the TAC, challenging the fifth cause of action (challenging the Exempted Pumping Allotments) and the ninth through eleventh causes of action (the takings claims). The Authority argued the fifth cause of action is "nothing more than a further challenge to the calculation of the Replenishment Fee," and is thus still barred by the "pay first" rule. As for the takings claims, the Authority argued the challenged actions (which do not include the Replenishment Fee) imposed no economic burdens on Mojave, nor did they preclude the extraction of groundwater.

_____

Pumping Allotments"). We employ the terminology from the ordinance to avoid confusion.

17

The trial court held a lengthy hearing on the matter in December 2022. After taking the matter under submission, respondent court sustained the Authority's demurrer as to the fifth and eleventh causes of action without leave to amend and as to the ninth and tenth causes of action with leave to amend.[16]

Respondent court found the fifth cause of action's challenge to the Exempted Pumping Allotment was "simply a disguised challenge to the Replenishment Fee itself, meaning it's still barred by the 'pay first, litigate later' rule." As for the regulatory takings claims (the ninth and tenth causes of action), the court reasoned the TAC specifically removed any reference to the Replenishment Fee, and these claims are instead based on the Authority's groundwater sustainability plan, the Sustainable Yield Report, Exempted Pumping Allotments, and Transient Pool and Fallowing Program, none of which, "*without reference to the Replenishment Fee,* [has] an economic effect on Mojave." As for the physical takings claim (the eleventh cause of action), the court reasoned Mojave had not alleged it was in fact physically prevented from extracting water, and thus had not stated a claim.

Mojave petitioned this court for a writ of mandate in February 2023, requesting de novo review of respondent court's ruling on the demurrer. We issued an order to show cause why mandate or other appropriate relief should not be issued; we also invited additional briefing by the parties. We later accepted briefing by several amici curiae, entertained oral argument, and invited supplemental briefing after oral argument.

---

[16] Respondent court acknowledged that the Extraction Fee, which Mojave has paid, is a separate basis for the ninth and tenth causes of action and therefore allowed Mojave to file a further amended petition basing these causes of action on the Extraction Fee explicitly.

18

**DISCUSSION**

1.    *Writ Review is Appropriate*

"In order to confine the use of mandamus to its proper office, the Supreme Court, in various cases, has stated general criteria for determining the propriety of an extraordinary writ: (1) the issue tendered in the writ petition is of widespread interest [citation] or presents a significant and novel constitutional issue [citation]; (2) the trial court's order deprived petitioner of an opportunity to present a substantial portion of his cause of action [citations]; (3) conflicting trial court interpretations of the law require a resolution of the conflict [citation]; (4) the trial court's order is both clearly erroneous as a matter of law and substantially prejudices petitioner's case [citations]; (5) the party seeking the writ lacks an adequate means, such as a direct appeal, by which to attain relief [citation]; and (6) the petitioner will suffer harm or prejudice in a manner that cannot be corrected on appeal [citations].  The extent to which these criteria apply depends on the facts and circumstances of the case." (*Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1273-1274.)

The issues raised in this writ proceeding are of widespread interest and importance.  Litigation challenging the actions of groundwater sustainability agencies under SGMA may impact thousands of water users throughout the state for years to come.  Whether the "pay first" rule applies in litigation challenging SGMA fees is a novel question, the answer to which could impact groundwater extractors throughout the state; it has yet to be addressed by any appellate decision.  Accordingly, writ review is warranted.  (See *Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 657 ["a writ of mandate *should* not be denied when 'the issues presented are of great public importance and must be resolved promptly,'" and the "receipt of numerous amicus curiae briefs underscores the importance of this issue"].)

19

2.      *Standard of Review*

"When a party seeks writ review of a trial court's order [on] a demurrer, '[t]he "ordinary standards of demurrer review still apply."'  [Citation.]  We independently determine whether the complaint states a cause of action.  [Citation.]  We reasonably interpret the complaint, 'reading it as a whole and its parts in their context.'  [Citation.]  We deem true '"all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.  [Citation.]  '"We also consider matters which may be judicially noticed."'  (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2019) 42 Cal.App.5th 148, 153-154 (*Presbyterian Camp*).)

3.      *The "Pay First" Rule Generally*

"A taxpayer ordinarily must pay a tax before commencing a court action to challenge the collection of the tax.  This rule, commonly known as 'pay first, litigate later,' is well established and is based on a public policy reflected in the state Constitution, several statutes, and numerous court opinions."  (*County of Los Angeles v. Southern Cal. Edison Co*. (2003) 112 Cal.App.4th 1108, 1116 (*So. Cal. Edison*).)

The constitutional source of the "pay first" rule is article XIII, section 32 of the California Constitution:  "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax.  After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."  (Cal. Const. art. XIII, § 32 (hereafter article XIII, section 32).)[17]

_____

[17]      Although article XIII, section 32 is often cited in "pay first" jurisprudence, the doctrine existed long before section 32's predecessor provision was added to the California Constitution in 1910, having received judicial recognition for nearly a century before that.  (See *Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472, 495-496 (*Chiatello*) [collecting cases].)

20

"Read together, these two portions of section 32 establish that the sole legal avenue for resolving tax disputes is a postpayment refund action. A taxpayer may not go into court and obtain adjudication of the validity of a tax which is due but not yet paid." (*State Bd. of Equalization v. Superior Court* (1985) 39 Cal.3d 633, 638 (*State Board*).)

The "pay first" rule also appears in numerous statutes. Some statutes use language similar to article XIII, section 32 and "prohibit an action to prevent or enjoin the collection of specified taxes imposed by state or local government. (E.g., Rev. & Tax. Code, §§ 4807 [property tax], 6931 [sales and use taxes], 19381 [franchise and income taxes].) Other statutes provide for an action to recover a refund after payment is made. (*Id.*, §§ 5140 [property tax], 6933 [sales and use taxes], 19382 [franchise and income taxes].)" (*So. Cal. Edison, supra,* 112 Cal.App.4th at pp. 1116-1117.) As we discuss below, the rule is also codified in SGMA. (See § 10726.6(d).)[18]

---

[18] Mojave correctly notes the first sentence of article XIII, section 32 refers to actions against the "State," and there is a split of authority as to whether the "pay first" rule embodied in section 32 applies to local taxes in the absence of a "pay first" statute. A number of courts have applied section 32's "pay first, litigate later" principle to actions against local governments as a matter of public policy. (See, e.g., *Water Replenishment Dist. of Southern California v. City of Cerritos* (2013) 220 Cal.App.4th 1450, 1466-1468 (*City of Cerritos*); *Chodos v. City of Los Angeles* (2011) 195 Cal.App.4th 675, 680; *Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129, 1136-1137 (*Flying Dutchman*).) Other courts, however, have held article XIII, section 32 applies only to actions against the state, as stated in the provision. (See, e.g., *City of Anaheim v. Superior Court* (2009) 179 Cal.App.4th 825, 830 (*City of Anaheim*) ["Article XIII, Section 32 . . . does not bar the [plaintiffs'] actions here [against the city] because courts have limited this constitutional provision to actions against the state or an officer of the state"]; *County of Los Angeles v. Superior Court* (2008) 159 Cal.App.4th 353, 363 fn. 6 ["'Section 32 applies only to actions against the state'"].) We agree with the former group that, even in the absence of a statute calling for the application of the "pay first" rule to a given situation, article XIII, section 32 applies to both state and local governments as a matter of public policy. Ultimately, however, this is a moot issue because as discussed below, the "pay first" rule also appears in the text of SGMA. (See § 10726.6(d).)

21

The "pay first" rule advances an important public policy in that it "ensures that essential public services are not disrupted during the pendency of tax challenges." (*Andal v. City of Stockton* (2006) 137 Cal.App.4th 86, 90.) That is, it "'allow[s] revenue collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted.' [Citation.] 'The fear that persistent interference with the collection of public revenues, for whatever reason, will destroy the effectiveness of government has been expressed in many judicial opinions.'" (*State Board, supra,* 39 Cal.3d at pp. 638-639.) As the United States Supreme Court recognized over 150 years ago, any delay in the collection of taxes "may derange the operations of government, and thereby cause serious detriment to the public." (*Dows v. City of Chicago* (1870) 78 U.S. 108, 110.) "The prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government. The idea that every tax-payer is entitled to the delays of litigation is unreason." (*Springer v. United States* (1880) 102 U.S. 586, 594.)

Article XIII, section 32's "pay first" rule is "construed broadly to bar not only injunctions but also a variety of prepayment judicial declarations or findings which would impede the prompt collection of a tax." (*State Board, supra,* 39 Cal.3d at p. 639.) "It is well established that the applicability of section 32 does not turn on whether the action at issue specifically seeks to prevent or enjoin the collection of a tax. . . . [Citation.] The relevant issue is whether granting the relief sought would have the effect of impeding the collection of a tax." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247-248 (*California Logistics*); see *Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 280 (*PG&E*) ["a taxpayer may not circumvent restraints on prepayment tax litigation by seeking only declaratory relief"].) In other words, "if the 'net result of the relief prayed for . . . would be to restrain the collection of the tax allegedly due, the action must be treated as one having that

22

purpose.'"  (*West Hollywood Community Health & Fitness Center v. California Unemployment Ins. Appeals Bd.* (2014) 232 Cal.App.4th 12, 22.)

The "pay first" rule is often invoked at the pleading stage, resulting in an order sustaining a demurrer.  (See, e.g., *California Logistics, supra,* 161 Cal.App.4th at p. 245; *Flying Dutchman, supra,* 93 Cal.App.4th at p. 1132.)  Indeed, "the public policy supporting extension of the rule is more compelling when there has been no trial of the ultimate issues but only a ruling on a demurrer to a taxpayer's complaint or on a dispositive pretrial motion."  (*So. Cal. Edison, supra,* 112 Cal.App.4th at pp. 1119-1120.)

The fact that a petitioner's lawsuit is based on the alleged illegality of the challenged tax under state law does not excuse compliance with the "pay first" rule.  "It has long been established that suits to enjoin the collection of taxes may not be maintained even though the imposition of the tax may be 'illegal and void.'"  (*Flying Dutchman, supra,* 93 Cal.App.4th at p. 1141; see *Chiatello, supra,* 189 Cal.App.4th at pp. 492-493 [historically, "a tax would be enjoined only in very rare instances where more than a naked claim of illegality was raised[, and] '"[a] suit in equity will not lie to restrain the collection of a tax on the sole ground that the tax is illegal"'"].)

Nor does a petitioner's alleged inability to pay the assessment and the resulting lack of opportunity for judicial review violate the taxpayer's right to due process.  (*California Logistics, supra,* 161 Cal.App.4th at p. 251; see *Modern Barber Col. v. Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 725–726 ["The due process clause does not guarantee the right to judicial review of tax liability before payment"]; *PG&E, supra,* 27 Cal.3d at p. 282 [historically, "the most severe financial hardship resulting in bankruptcy was judged not to be an irreparable injury sufficient to permit judicial intervention" in violation of "pay first" rule].)

The "pay first" rule comports with due process requirements so long as there is "'a procedure which, *at some point*, provides the taxpayer a meaningful opportunity to contest the legality of the exaction.'"  (*City of Anaheim, supra,*

179 Cal.App.4th at p. 831, italics added.)  This "most often takes the form of refund procedure provided for in the applicable statute, and courts have consistently upheld 'pay first' requirements in matters involving local taxes where the taxing authority has specifically provided for a refund procedure."  (*Ibid.*; see *McKesson v. Div. of Alcoholic Beverages* (1990) 496 U.S. 18, 51 [federal due process principles simply require "'a clear and certain remedy,'" such as a "refund of the excess taxes paid by the petitioner"]; *Reid v. City of San Diego* (2018) 24 Cal.App.5th 343, 358 (*Reid*) [government must provide either a predeprivation process or postdeprivation relief; either is sufficient so long as the remedy is clear and certain].)

There are several recognized exceptions to the "pay first" rule.  One arises when the tax ordinance being challenged provides for criminal penalties for failure to pay.  (See *Flying Dutchman, supra,* 93 Cal.App.4th at pp. 1139-1140 [collecting cases].)

A second exception applies if the party seeking to prevent the tax collection has no adequate remedy at law, in which case the taxpayer may be entitled to equitable relief.  (*Flying Dutchman, supra,* 93 Cal.App.4th at p. 1138.)  However, this exception rarely applies because "[a]ny remedy that allows a taxpayer to challenge a tax already collected, and to press any constitutional claims he or she may have, has been found to constitute '"a plain, speedy and efficient remedy"' barring equitable relief."  (*Ibid.*; see *Chiatello, supra,* 189 Cal.App.4th at p. 493 ["if there was an adequate remedy at law—which almost always meant a refund procedure—the collection of a tax would not be halted by the courts"]; *City of Anaheim, supra,* 179 Cal.App.4th at p. 831 [noting "[t]he 'adequate remedy at law' most often takes the form of refund procedure provided for in the applicable statute" and collecting cases].)

A third exception appears when the ban on prepayment judicial review violates the federal Constitution.  However, this exception is "limited to those situations in which it is clear that '"under no circumstances" can the government prevail,'" where "'it is . . . apparent that, under the most liberal view of the law and the facts, the

24

[government] cannot establish its claim,'" or where the government "has no conceivable basis in law or fact for assessing [the] tax."  (*Western Oil & Gas Assn. v. State Bd. of Equalization* (1987) 44 Cal.3d 208, 214; see *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 839 (*Calfarm*).)

4.       *Applicability of the "Pay First" Rule in Water Cases*

No court has yet determined whether the "pay first" rule applies in cases challenging fees imposed by a groundwater sustainability agency under SGMA. However, two cases have recognized that groundwater assessments imposed in other contexts are subject to the rule.

In *City of Cerritos*, the court applied the "pay first" rule to a city that had stopped paying a water replenishment assessment to the local water replenishment district after another court made an interim order finding the assessment was invalid under Proposition 218.  (*City of Cerritos, supra*, 220 Cal.App.4th at pp. 1453-1454.)  The court concluded article XIII, section 32 barred the city from using the pending Proposition 218 case to defensively interfere with collection of the assessment, and the city was required to either pay the assessment or stop producing groundwater until there was a final judgment in the Proposition 218 lawsuit.  (*City of Cerritos,* at pp. 1464-1470.)  Thus, the district was entitled to a preliminary injunction enjoining the city from producing groundwater during the pendency of the Proposition 218 lawsuit unless and until the city paid the delinquent assessment.  (*City of Cerritos,* at pp. 1470-1471.)

The "pay first" rule was also applied to water fees in *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425.  That case involved a class action complaint filed on behalf of water customers to preserve their alleged right to continue receiving water at reasonable rates from a historical water delivery system owned and operated by the city.  (*Id.* at p. 428.)  The trial court sustained the city's demurrer to causes of action seeking to enjoin the city from continuing a surcharge fee and imposing future rate structures.  The court of appeal affirmed, noting that the trial

25

court had correctly cited *City of Cerritos* for the proposition that "water assessments are subject to the "'pay first, litigate later'" rule." (*Id.* at p. 441.)

Neither of these cases involved a challenge to fees imposed by a groundwater sustainability agency under SGMA. More relevant to our analysis, therefore, is the fact that the Legislature included a "pay first" requirement in SGMA.

Specifically, section 10726.6(d) provides: "Any person may pay a fee imposed pursuant to Section 10730, 10730.2, or 10730.4 under protest and bring an action against the governing body in the superior court to recover any money that the governing body refuses to refund. Payments made and actions brought under this section shall be made and brought in the manner provided for the payment of taxes under protest and actions for refund of that payment in Article 2 (commencing with Section 5140) of Chapter 5 of Part 9 of Division 1 of the Revenue and Taxation Code, as applicable."

California courts have not yet addressed whether this statutory language amounts to a "pay first" requirement. However, in *Los Altos Golf & Country Club v. County of Santa Clara* (2008) 165 Cal.App.4th 198 (*Los Altos*), the court interpreted a nearly identical statutory provision, Health and Safety Code section 5472,[19] and concluded it meant that "payment 'under protest' was necessary before pursuing a claim for refund of fees asserted to be invalid." (*Los Altos,* at pp. 201, 206.) Because the plaintiffs in that case had not paid the challenged sewer assessments before filing their

---

[19] Section 10726.6(d) in SGMA tracks Health and Safety Code section 5472 nearly verbatim. Section 5472 provides: "After fees, rates, tolls, rentals or other charges are fixed pursuant to this article, *any person may pay* such fees, rates, tolls, rentals or other charges *under protest and bring an action against the* city or city and county *in the superior court to recover any money* which *the* legislative *body refuses to refund. Payments made and actions brought under this section, shall be made and brought in the manner provided for payment of taxes under protest and actions for refund* thereof *in Article 2, Chapter 5, Part 9, of Division 1 of the Revenue and Taxation Code*, insofar *as* those provisions are *applicable*." (Italics added.) We have italicized the portions of Health and Safety Code section 5472 that also appear in Water Code section 10726.6.

lawsuit, their "action was foreclosed by their failure to follow the prescribed procedures"; the lower court therefore "did not err in sustaining [the city's] demurrer without leave to amend." (*Id.* at p. 207.)

In reaching this conclusion, the *Los Altos* court rejected the argument that "the payment-under-protest language of [Health and Safety Code] section 5472—'any person *may* pay . . . under protest'—[w]as permissive, [rather than] mandatory." (*Los Altos, supra,* 165 Cal.App.4th at p. 206.) "It is the challenge itself that is optional, not the method of raising that challenge. Of course users of sewer services *may* challenge excessive fees if they wish to do so; but the manner in which they assert that challenge is prescribed by the statute." (*Ibid.*; see also *Padilla v. City of San Jose* (2022) 78 Cal.App.5th 1073, 1080 [relying on *Los Altos* and Health & Saf. Code, § 5472 to conclude "plaintiffs were required to pay [the challenged garbage collection fees] under protest before suing for a refund"].)

We presume the Legislature was aware of Health and Safety Code section 5472 and the 2008 *Los Altos* decision when it enacted Water Code section 10726.6(d) in 2014. Given the two statutes use nearly identical language, we further presume the Legislature intended that the *Los Altos* court's interpretation of section 5472 should apply to section 10726.6(d). (See *Presbyterian Camp, supra,* 42 Cal.App.5th at p. 154 [we presume the Legislature was aware of existing laws and their judicial interpretation when enacting a statute, and that the Legislature intended the same interpretation apply to laws with substantially similar language].)

We therefore conclude that section 10726.6(d) of SGMA requires a person who seeks to challenge a groundwater fee imposed under SGMA to first pay the fee before bringing an action for a refund. And, just as in *Los Altos*, we conclude the fact that section 10726.6(d) uses the words "*may pay* . . . under protest" does not make compliance optional.

27

5. *Application of the "Pay First" Rule Here*

Having concluded the "pay first" rule, enshrined in the California Constitution (art. XIII, § 32) and included by statute in SGMA (§ 10726.6(d)), applies to lawsuits challenging fees imposed by a local groundwater sustainability agency under SGMA, we must determine the rule's application here. Mojave has not paid any portion of the Replenishment Fee. Accordingly, any cause of action that attacks the propriety of the Replenishment Fee or attempts to impede its prompt collection cannot proceed, unless an exception to the "pay first" rule applies.

We have considered the recognized exceptions to the "pay first" rule, set out above, and conclude none apply here. Ordinance No. 03-20 does not call for criminal penalties for failure to pay the Replenishment Fee. There is no due process concern from imposing the "pay first" rule because water extractors have an adequate remedy at law in the form of a postpayment refund procedure (see § 10726.6(d)). And given the Basin's severe overdraft status, as recognized by the Department of Water Resources, and the fact that SGMA expressly authorizes agencies to impose fees, we cannot say the Authority had no conceivable basis in law or fact for assessing the Replenishment Fee such that the ban on prepayment judicial review would violate the federal Constitution.[20]

---

[20] Asserting that "[o]ther exceptions apply," and citing *Reid, supra,* 24 Cal.App.5th 343 for the proposition that "the 'pay first, litigate later' rule does not apply where, as here, the [government] has specifically provided a prepayment remedy" (*id.* at p. 357), Mojave argues the "pay first" rule does not apply because SGMA includes a prepayment remedy in section 10726.6, subdivision (c), which states: "Any judicial action or proceeding to attack, review, set aside, void, or annul the ordinance or resolution imposing a new, or increasing an existing, fee imposed pursuant to Section 10730, 10730.2, or 10730.4 shall be commenced within 180 days following the adoption of the ordinance or resolution."

We disagree. Mojave is correct when it argues that as long as a government "provides a clear and certain remedy, it may determine to provide predeprivation process instead of postdeprivation relief." (*Reid, supra,* 24 Cal.App.5th at p. 358.) But that is not what the Legislature did here. Section 10726.6, subdivision (c), is not a prepayment remedy; rather, it is the statute of limitations applicable to any action challenging a

28

During oral argument, Mojave invited us to create a new exception to the "pay first" rule, such that it would not apply for public policy reasons when a groundwater agency's sustainability plan acts inconsistently with California water law, such as by improperly determining water rights. We decline to do so. The fact that petitioner's lawsuit is based on the alleged illegality of the challenged tax does not excuse compliance with the "pay first" rule. (*Flying Dutchman, supra,* 93 Cal.App.4th at p. 1141 ["It has long been established that suits to enjoin the collection of taxes may not be maintained even though the imposition of the tax may be 'illegal and void'"].) Also, creating such an exception here would be problematic because it would require a court to adjudicate the validity of a groundwater agency's sustainability plan and competing water rights claims at the demurrer stage. That runs contrary to what the Legislature contemplated when it enacted SGMA—namely, that groundwater sustainability plans

---

groundwater fee ordinance, including a fee refund action under section 10726.6(d).

Mojave contends this interpretation is "untenable" because Ordinance No. 03-20 was adopted on August 21, 2020, but the first Replenishment Fee under the ordinance was not due until February 15, 2021 (assuming a user actually extracted groundwater in January 2021); thus, anyone who wanted to challenge the ordinance's Replenishment Fee would have had to file an action just two days after paying the fee, on February 17, 2021 (180 days after the ordinance's adoption). Mojave further asserts that farmers who did not pump any groundwater in January would be entirely barred from challenging any aspect of Ordinance No. 03-20, including the Exempted Pumping Allotments, because no fee would be due before February 17, 2021.

We are not persuaded. As we read it, section 10726.6, subdivision (c), required any lawsuit attacking the fee imposed by Ordinance No. 03-20 to be filed by February 17, 2021 (180 days after its adoption). If a party extracted groundwater and owed a Replenishment Fee before filing an action, that party would need to pay the fee in order to file the complaint as stated in section 10726.6(d). Conversely, if the party did not extract groundwater or incur a Replenishment Fee until *after* the February 17, 2021 filing deadline, that party would still need to comply with the filing deadline, and then would also have to pay the Replenishment Fee, once incurred, in order to continue *maintaining* the action.

29

would first be put into place, and then any dissatisfied persons could bring an adjudication action to determine water rights. (See §§ 10737-10738.)

Creating a new exception here would also undermine the public policies that underlie the "pay first" rule, such as ensuring the continued provision of public services funded by taxes, or in this case, the replenishment fees. It bears noting that for nearly three years, Mojave has extracted thousands of acre-feet of groundwater without paying the Replenishment Fee. If groundwater extractors like Mojave can challenge a fee without first paying it, that could defeat SGMA's goal of managing overdrafted groundwater basins.

Accordingly, we hold that any cause of action that attacks the propriety of the Replenishment Fee or attempts to impede its prompt collection cannot proceed unless Mojave first pays the outstanding amounts owed. This is true even if the challenged fee allegedly violates SGMA and California water law, and even if Mojave allegedly cannot afford to pay the fee. (See *California Logistics, supra,* 161 Cal.App.4th at p. 251 [rejecting due process challenge to "pay first" rule's application, even though the plaintiff could not afford to pay proposed $1.2 million assessment]; see also *City of Cerritos*, *supra,* 220 Cal.App.4th at p. 1469 [applying "pay first" rule where outstanding water assessments totaled $7 million].)

In reaching this holding, we are mindful that a rigid application of the "pay first" rule could allow local groundwater sustainability agencies to impose unreasonable fees that target certain users, knowing they would be unable to afford to pay the fees under protest, and that those users could eventually be run out of business. However, that is not the case before us today, and we decline to resolve the slippery issue of determining when, if ever, a fee or tax would be so extraordinarily high that the "pay first" rule should not apply.[21]

---

[21] The Replenishment Fee of $2,130 per acre-foot is not grossly out of line with the fees charged by other agencies. The Authority presents evidence, for example,

That brings us to determining how the "pay first" rule applies to the TAC. As noted, when ruling on the Authority's demurrer to Mojave's FAC in 2021, respondent court relied on the "pay first" rule to sustain the demurrer to the sixth cause of action (challenging the Replenishment Fee) without leave, and to sustain the demurer to the fourteenth through eighteenth causes of action (takings and due process claims) with leave. In an attempt to plead itself out of that ruling and minimize any reliance on the unpaid Replenishment Fee, Mojave's TAC challenges the Exempted Pumping Allotments in the same ordinance, as well as the other Implementing Actions such as the Sustainable Yield Report and the Transient Pool and Fallowing Program. We conclude this amounts to a distinction without a difference.

    a.    *Cause of Action No. 5*

We first consider Mojave's fifth cause of action, which challenges the Exempted Pumping Allotments in Ordinance No. 03-20. As noted, Ordinance No. 03-20 provided that all groundwater extractions (except those by federal and de minimis extractors) would be subject to the Replenishment Fee of $2,130 per acre-foot starting in January 2021. In the subsequent paragraph, Ordinance No. 03-20 specified how the Basin's 7,650 acre-feet sustainable yield should be divided among certain municipal entities, granting those entities annual Exempted Pumping Allotments in varying amounts that are not subject to the Replenishment Fee.

Mojave did not receive an Exempted Pumping Allotment, so in its fifth cause of action, it alleges the Authority arbitrarily and capriciously granted Exempted Pumping Allotment to certain users, but not Mojave, in violation of Mojave's common law and constitutional rights to water. According to Mojave, "because [Mojave was] denied any [Exempted] Pumping [Allotments], [Mojave] can no longer rely on [its] prior and paramount overlying right to pump [its] correlative share of the Basin's native yield,

---

that the Antelope Valley-East Kern Water Agency charges about $1,700 per acre-foot.

31

and instead must pay the Replenishment Fee." (TAC ¶ 402.) Mojave therefore asked respondent court to compel the Authority to prevent the implementation of the Exempted Pumping Allotments and to comply with all applicable laws in adopting accurate and legal allotments.

Mojave insists it is not challenging the Replenishment Fee, but rather the Exempted Pumping Allotments, which are not a tax and therefore not subject to the "pay first" rule. Respondent court was not persuaded; neither are we.

In sustaining the Authority's demurrer to this cause of action, respondent court determined "this cause of action is simply a disguised challenge to the Replenishment Fee itself." "The Court does not see how the [Exempted] Pumping [Allotments] cause Mojave any harm other than requiring it to pay a larger Replenishment Fee than extractors who received allocations. This means a challenge to the [Exempted] Pumping [Allotments] is effectively a challenge to the Replenishment Fee itself, which is barred by the 'pay first, litigate later' rule."

We agree. The Replenishment Fee and the Exempted Pumping Allotment provisions appear on the same page and in the same section of Ordinance No. 03-20, all under the heading, "Section 3. Basin Replenishment Fee." They clearly operate together: the greater an entity's Exempted Pumping Allotment, the lower its Replenishment Fee will be. Because Mojave did not receive any Exempted Pumping Allotment, it must pay a Replenishment Fee on every acre-foot of groundwater it extracts. If Mojave were to succeed in a legal challenge to the Exempted Pumping Allotment and obtain an order that it should receive a certain portion of the annual sustainable yield, the net result would be a lower Replenishment Fee.

Mojave insists it is challenging the Authority's illegal determination that Mojave holds "inferior" water rights and should receive no allocation of native groundwater. Again, this is not a meaningful distinction. In our view, challenging the Authority's determination that Mojave is not entitled to free groundwater and therefore

32

must pay the Replenishment Fee is ultimately the same thing as challenging the Authority's determination that Mojave must pay the Replenishment Fee.

Citing *Calfarm, supra,* 48 Cal.3d 805, Mojave insists the Exempted Pumping Allotment section of the ordinance is severable from the Replenishment Fee provision and therefore subject to judicial review notwithstanding the "pay first" rule. We cannot agree. To be subject to review, the invalid provision must be, among other things, grammatically severable, in that it "constitutes a distinct and separate provision [that] can be removed as a whole without affecting the wording of any other provision." (*Id.* at p. 822.) In this case, the Replenishment Fee and the Exempted Pumping Allotment chart all appear in the same section of Ordinance No. 03-20, all under the heading, "Section 3. Basin Replenishment Fee."

Accordingly, if Mojave desires to challenge the fact that it did not receive an Exempted Pumping Allotment under Ordinance No. 03-20 in violation of its alleged water rights, it must first pay the Replenishment Fee due under that same ordinance. Respondent court did not err in sustaining the Authority's demurrer on the fifth cause of action.

b.      *Cause of Action Nos. 9-11*

That leaves Mojave's takings causes of action. As noted, the ninth through eleventh causes of action of the TAC allege that the Authority, through the adoption of the Exempted Pumping Allotments and other Implementing Actions (excluding the Replenishment Fee), has deprived Mojave of all economically beneficial use of its water rights and pistachio trees, and that this amounts to a physical and regulatory taking of private property without just compensation in violation of the state and federal Constitutions and section 1983 of title 42 of the United States Code. Mojave claims the Authority has taken its vested overlying water right to pump native groundwater from the

33

Basin for use on its land and made Mojave's water available for public use by others without just compensation.[22]

---

[22] It is unclear to us to what extent Mojave has such a right. As a different panel of this court not long ago observed, "Groundwater belongs to the state, not any person or entity, but may be extracted by those with the right to do so, including those whose land overlies the groundwater source. 'At least since 1928 when the predecessor to article X section 2 of the California Constitution was adopted, there is no private ownership of groundwater. [Citation.] The State of California owns all of the groundwater in California, not as a proprietary owner, but in a manner that empowers it to supervise and regulate water use. [Citation.] Water rights holders have the right to "take and use water," but they do not own the water and cannot waste it. . . . Under the "correlative rights doctrine," "as between the owners of land overlying strata of percolating waters, the rights of each to the water are limited, in correlation with those of others, to his 'reasonable use' thereof when the water is insufficient to meet the needs of all."'" (*Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 336; see *Antelope Valley Groundwater Cases* (2021) 62 Cal.App.5th 992, 1023, 1022 ["'landowner whose property overlies the groundwater'" has "'[f]irst priority'" to groundwater, subject to usufructuary interests of other overlying landowner, but "when the native supply 'is insufficient, each is limited to his *proportionate fair share* of the total amount available based upon his reasonable need'"].)

In this case, Mojave claims to have a vested water right to pump native groundwater from the Basin for use on its land, but it has never specified the quantity of its water right or its priority vis-à-vis other extractors, which raises several questions:

- Assuming the Basin's sustainable yield is only 7,650 acre-feet per year, how can multiple extractors each have a viable common law right to most or all of that water?

- Is using the Basin's limited groundwater to irrigate a water-intensive crop like pistachios in the middle of the high desert a "reasonable and beneficial" use of water protected under the California Constitution, particularly considering most of those trees were planted less than 10 years ago? (See Cal. Const., art. X, § 2.)

- Does a vested overlying right to groundwater mean a vested overlying right to *free* groundwater?

- SGMA states that any judgment in an adjudication action for a basin required to have a groundwater sustainability plan must not substantially impair the ability of a groundwater sustainability agency to

34

Respondent court was not persuaded. As for the regulatory takings claims (the ninth and tenth causes of action), the court reasoned that the TAC specifically removed any reference to the Replenishment Fee, and these claims are instead based on the Authority's groundwater sustainability plan, the Sustainable Yield Report, Exempted Pumping Allotments, and Transient Pool and Fallowing Program, none of which, "*without reference to the Replenishment Fee,* [has] an economic effect on Mojave." As for the physical takings claim (the eleventh cause of action), the court reasoned that Mojave had not alleged it was in fact physically prevented from extracting water, and thus had not stated a claim.

We agree with respondent court's analysis. If Mojave had paid the Replenishment Fee in compliance with the "pay first" rule, it could perhaps state a takings cause of action on the theory that the Replenishment Fee makes Mojave's agricultural operations economically unviable because the fees for extracting groundwater are so high. Perhaps because Mojave has not paid the fee, however, it omitted any reference to the Replenishment Fee from the TAC's takings claims, instead relying on the other Implementing Actions.

As respondent court correctly concluded, this attempt to escape the previous demurrer ruling fails because the only Implementing Action with an economic effect on Mojave is the Replenishment Fee. Since none of the other Implementing Actions physically prevent Mojave from extracting groundwater or interfere

---

achieve sustainable groundwater management. (§ 10737.8.) What impact does that rule have on common law groundwater rights?

We need not, and expressly do not, decide these difficult issues today. Indeed, it would be inappropriate to determine the relative priority of Mojave's water rights in the vacuum of an appellate writ proceeding without other water extractors present. We anticipate these issues will instead by addressed in the related adjudication action; we express no view on the appropriate resolution.

35

economically with Mojave's ability to extract groundwater, Mojave's TAC fails to state a cause of action for a taking.

## DISPOSITION

The petition for writ of mandate is denied. The order to show cause is discharged.  The stay imposed by this court is dissolved upon finality of this opinion. The parties shall each bear their own costs in this proceeding.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


SANCHEZ, J.